Philip H. Gordon ISBN 1996
Bruce S. Bistline ISBN 1988
**GORDON LAW OFFICES**
623 West Hays Street
Boise, ID  83702
Tel:   208- 345-7100
Fax:  208- 345-0050

Geoffrey Bestor (*pro Haec vice forthcoming*)
**LEVETOWN & JENKINS LLP**
700 12th Street, NW
Washington, DC 20005
Tel:  202-379-4899
Fax:  866-626-3131

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Russell Firkins, Rena Firkins, Highland Services Co., Inc. Profit Sharing Plan, Douglas R. Circle as trustee, Douglas Richard Circle and Jan Alison Circle 1984 Family Trust<br><br>        Plaintiffs,<br><br>v.<br><br>TitleOne Corporation,<br><br>        Defendant. | Case No. _____<br><br>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL |

Plaintiffs Russell Firkins, Rena Firkins, Highland Services Co., Inc. Profit Sharing Plan, Douglas R. Circle as trustee of the Douglas Richard Circle and Jan Alison Circle 1984 Family Trust, on behalf of themselves and others similarly situated, allege and complain as follows:

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL                    1

NATURE OF THE CASE

1.      This is a class action on behalf of all investors in bonds issued pursuant to an indenture dated December 24, 2002 (the "Indenture") (attached hereto as Ex. A).  Pursuant to the Indenture and the Offering Circulars associated with the bond issue, DBSI Real Estate Funding Corporation ("REFCO") raised money for use in the commercial and residential real estate investment activities of related entities.   Defendant TitleOne Corporation ("Defendant" or "TitleOne") was the designated Trustee under the Indenture.  The Indenture is a contract between the Plaintiff bondholders, TitleOne, and REFCO and was explicitly incorporated in the bond certificates issued to Plaintiffs.

2.      REFCO, which was created specifically for the purpose of raising funds pursuant to the Indenture, was an affiliate of the DBSI Group.  The DBSI Group consisted of related companies that invested in real estate (the DBSI entities as a whole are referred to hereinafter as "DBSI" except when clarity requires more specificity).  Under the Indenture, REFCO sold bonds to investors and lent the resulting funds to various DBSI entities for individual real estate investments.

3.      Each time REFCO lent money to a DBSI entity, DBSI was required to document fully the uses to which that DBSI entity put the money.  The reason for this was that DBSI was in control of REFCO and essentially made loans to itself.  The Indenture protected the REFCO bondholders by providing that all right, title, and interest in real estate acquired using bondholder funds passed through to a trust in which the bondholders were the beneficiaries.  TitleOne was the Trustee of that trust.

4.      The Indenture required DBSI to provide TitleOne with extensive documentation of each and every transaction, including documentation of the security interests which DBSI

obtained in each parcel of property in which REFCO funds were invested.  The Indenture

imposed on TitleOne not only the obligation to receive and maintain the documentation, but also

to ensure that DBSI used REFCO funds properly and obtained and perfected the security

interests.

5.      DBSI and its affiliated entities, including REFCO, filed for bankruptcy protection

in the District of Delaware in November, 2008.  At that point bondholders had over $42 million

in principal and accrued interest invested in REFCO.  Very extensive reports by the examiner

appointed by the bankruptcy court show that DBSI was no more than a Ponzi scheme from at

least 2004, if not earlier.

6.      In November 2008, TitleOne provided to Plaintiff Douglas Circle the transaction

documents that TitleOne represented showed the full extent of the bondholders' then-current

security interests in real property acquired by DBSI using REFCO funds.  There is not a single

document reflecting a security interest in any parcel real property in the materials provided by

TitleOne.  There are no deeds of trust or mortgages.  Indeed, none of the transactions reflected in

the documents even provided for DBSI to have acquire a security interest in real property.

7.      Moreover, the documents provided by TitleOne show on their face that DBSI was

stealing the bondholders' money.  It did not require the services of a forensic accountant to

know what DBSI was doing.  Rather, the scheme DBSI perpetrated was obvious on its face.  The

documents provided by TitleOne show on their face the following:

>    a.    DBSI loaned itself almost $900,000 of REFCO money secured by a "personal
>          property" interest in property worth at most $600,000, property that already
>          secured over $1.5 million in loans;
>
>    b.    Duplicate loan applications contained wildly different, and totally unsupported,
>          valuations of property in which REFCO funds were invested;

    c.  DBSI routinely fabricated the value of investment properties, including arbitrarily increasing the supposed fair market value of existing investment property, in order to extract additional funds from REFCO;

    d.  Loans from REFCO were routinely secured by the "Borrower's personal property" interest in real estate; they were never secured by real property;

    e.  There is an almost complete absence of documentation of security interests. There is not a single security interest in real property and only two or three UCC-1s for the "borrower's personal property" interest which was the only "security" ever granted.

8.    TitleOne's documents show beyond any question that DBSI was pillaging REFCO from at least 2006 (TitleOne did not provide Plaintiff Circle with any earlier documents). If TitleOne had paid the slightest attention to its duties and obligations as Trustee under the Indenture, the REFCO bondholders could have avoided the disaster that has befallen them. TitleOne was a fiduciary to the bondholders, and it completely abdicated the duties imposed upon it in that capacity, and utterly failed to protect the interests of the bondholders.

## PARTIES

9.    Plaintiffs Russell and Rena Firkins are residents of Boise in the State of Idaho with a mailing address of P.O. Box 8807, Boise, ID 83707-2807. Mr. and Mrs. Firkins are trustees of Plaintiff Highland Services Co., Inc. Profit Sharing Plan, which is located in Boise, Idaho and shares the same mailing address. As of the date of the DBSI bankruptcy, Mr. and Mrs. Firkins owned REFCO bonds with a total principal and accrued interest amount of $506,253 and Highland Services Co., Inc. Profit Sharing Plan owned REFCO bonds with a total principal and accrued interest amount of $755,065.

10.    Plaintiff Douglas R. Circle is a resident of Placentia in the State of California, with an address of 1006 Segovia Circle, Placentia, CA 92870. Mr. Circle is trustee of the Douglas Richard Circle and Jan Alison Circle 1984 Family Trust at the same location. As of the date of

the DBSI bankruptcy, Douglas Richard Circle and Jan Alison Circle 1984 Family Trust owned REFCO bonds with a total principal and accrued interest amount $894,112.

11.     Defendant TitleOne Corporation is an Idaho corporation with its principal place of business at 1101 W. River Street, Suite 201, Boise, ID 83702.

JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which less than one-third of the proposed Plaintiff Class, on the one hand, and Defendant TitleOne, on the other, are citizens of the state of Idaho.

13.     This Court has jurisdiction over Defendant TitleOne because Defendant is an Idaho Corporation which maintains its principal headquarters in Idaho; is registered to conduct and does conduct business in the State of Idaho; and has sufficient minimum contacts in Idaho to render the exercise of jurisdiction by this Court proper and necessary.  Moreover, TitleOne's wrongful conduct as described herein occurred in Idaho.  Most, if not all, of the events complained of below occurred in or emanated from TitleOne's corporate headquarters located in Boise, Idaho.

14.     Venue is proper in this District under 28 U.S.C. § 1391(a) because Defendant TitleOne's principal place of business is in this District, Plaintiffs Russell and Rena Firkins reside in this district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

SUBSTANTIVE ALLEGATIONS

15.    DBSI Housing, Inc., was formed in 1980 as a vehicle for investment in commercial and residential real property.  DBSI Housing or an affiliate DBSI entity served as the general partner in multiple real estate investment partnerships.  During all times relevant to this case, DBSI and all of its affiliates were controlled by Douglas Swenson.

16.    Starting in the mid-1990s, DBSI raised funds from investors through bond offerings to finance DBSI's real estate acquisition and development activities.  DBSI Real Estate Funding Corporation, or REFCO, was created in 2002 for one of these bond issues.  In its initial issue, REFCO offered $5 million of 9 percent bonds due in approximately seven years.  REFCO was authorized to and did increase the bond issue, at its discretion.  Eventually REFCO sold more than $42 million of bonds to bondholders from 38 different states (figures as of the date of the DBSI bankruptcy).

17.    Defendant TitleOne served as Trustee of the trust created by the REFCO Indenture.  Plaintiffs allege, on information and belief, that TitleOne had never served as trustee for a bond issue before and has not since.

18.    The terms of the Indenture required that REFCO funds could be used only for real estate investment purposes.  "The proceeds of any Loans to DBSI Group controlled Entities will only be used to acquire, develop, and/or finance real estate properties prior to their sale, resale, financing, and/or syndication."  Offering Circular, Feb. 10, 2003, at p. 10.

19.    As of the date of the DBSI bankruptcy, the bondholders' outstanding principal and accrued interest in REFCO amounted to over $42 million.

20.    The duties and obligations of TitleOne were described in the offering documents and specified in the Indenture.  Among the recitals of the Indenture was the following:

NOW, THEREFORE, the Company [REFCO] covenants and agrees to grant, bargain, sell, assign, convey, and transfer the Trust Estate, as defined herein, in trust to the Trustee [TitleOne], and the parties agree that the Trust Estate is to be held by the Trustee for the equal and  proportionate benefit of all present and future holders of the bonds as follows:

21.     Section 1.33 of the Indenture defined "Trust Estate" in relevant part as follows:

**Trust Estate** shall mean, collectively, all right, title, interest, and estate, assigned hereunder to the trustee for the benefit of the Bondholders, whether now or hereafter acquired, in (i) the Loans and the Loan Collateral. including the present and continuing exclusive right, power, and authority to exercise each and every right, remedy, power, and authority of the Company under or in respect of the Loans and the Loan Collateral; (ii) the present and continuing exclusive right, power, and authority to make claim for, collect, receive, and receipt for any of the sums, amounts, income, revenues, issues, profits, and proceeds under, on account of or with respect to, the Loans and the Loan Collateral, including, without limitation, voluntary or involuntary, whether upon maturity, prepayment, acceleration, conversion, liquidation, casualty, or otherwise and paid from any source (including both timely and delinquent payments), (iii) all moneys and securities from time to time held by the Trustee in any account created under the terms of this Indenture and all interest, profits, proceeds, or other income derived from such moneys and securities; (iv) any and all property of every name and nature, now or hereafter transferred, mortgaged, pledged, or assigned as security or additional security for payment or performance of any obligation of the Borrowers [DBSI-controlled limited partnerships] under the Loans or any of the Loan Collateral or otherwise, and the liabilities, obligations, and indebtedness evidenced thereby or reflected therein; and (v) all income, revenues, issues, products, revisions, substitutions, replacements, profit, and proceeds of and from all of the foregoing.

22.     To effect the assignments to the trust, the Indenture required as follows:

**3.1.1**   The Company, by execution or this Indenture, agrees to and shall on each Loan Closing Date assign, transfer and otherwise convey to the trust created by the Indenture from time to time all right, title and interest in, to and under (i) all Loans and all Related Property appurtenant thereto, (ii) all monies due or to become due with respect thereto, and (iii) all proceeds of any of the foregoing.

23.     In order to ensure that the interests of the bondholders were protected, the Indenture required DBSI to provide extensive documentation of each transaction:

**3.1.2**   On each Loan Closing Date, the Trustee shall receive (i) the original Promissory Notes, (ii) each of the other original documents contained in the Loan File relating to each Loan, (iii) a list identifying the documents contained in such Loan File, (iv) if available, a copy of an appraisal summary for the assets related to the Loan, (v) a certificate signed by an authorized officer of the Company stating that the aggregate Loan to Value Ratio of the Loans and all underlying senior loans do not exceed 85%, (vi) a certificate of an authorized officer of the Company dated as of the Loan Closing Date certifying that all right, title, and interest in each Loan has been assigned, transferred or otherwise conveyed to the trust created by this Indenture, and such assignment complies with all requirements of this Indenture.   The Trustee shall within a reasonable time deliver any such documents to the Servicer upon the Servicer's written demand anytime possession of such original documents by the Servicer is necessary for the Servicer to perform its duties as Servicer and (vii) a certificate of an authorized officer of the Company dated as of the Loan Closing Date, certifying that the Loan file related to and delivered to the Trustee with respect to such Loan contains all documents listed in and required by the definition of the "Loan File."

**3.2    UCC Filing List.**    Within 30 days of each Loan Closing Date, the Company will deliver to the Trustee a list of the Uniform Commercial Code financing statement filings (or similar instruments covering any collateral securing payment on a Loan) made by the Company pursuant to this Indenture, which lists shall indicate with respect to each Loan, the name of the Borrower, the file number assigned to the Loan File, the jurisdiction where filed, and the original filing number and date.

24.    Section 11.1.8 of the Indenture provided: "The Trustee shall keep and maintain proper books of record and accounts relating to the Bonds in which full, true and correct entries will be made of all dealings or transactions of the Trustee in relation to the Bonds, Accounts and the Company."

25.    In short, the bondholders were to be protected by assignments of all right, title, and interest in loan collateral and other security, for each and every transaction using bondholder funds, with very extensive documentation requirements to back this up.  TitleOne, as trustee, was the bondholder's ultimate protection.  It was the duty of the trustee to ensure that DBSI used

REFCO funds consistently with the requirements of the Indenture, obtained security for the investments wherever possible, and documented every transaction in detail.

26.     As the Offering Circular dated February 10, 2003, stated: "The Indenture specifies the pledges and assignments, and the covenants and agreements and obligations of [REFCO].  The Trustee has the responsibility of assuring that those covenants, agreements, and obligations are performed by [REFCO]."  Offering Circ., Feb. 10, 2003, at p. 12.

27.     TitleOne completely failed in its duties. The following paragraphs are based on the documents provided by TitleOne that TitleOne identified as the transaction documentation required by the Indenture.[1]  That documentation is woefully incomplete, but even so it is obvious that TitleOne paid no attention whatsoever to and made no attempt to monitor the uses to which DBSI was putting REFCO funds.  Indeed, it appears that TitleOne did not even read the documentation DBSI was providing.  Had TitleOne done so, REFCO bondholders would have discovered by mid-2006, at the latest, that their money was being stolen.

28.     As noted above, there is not a single document creating a security interest in any parcel of real property for the benefit of the bondholders.  TitleOne, is a Title Insurance Company, which, among its other lines of business, regularly and continuously provides closing services for real property transactions.  As such it processes, and is presumed to understand the purpose and function of deeds of trust and mortgages.  The fact that it never received a single transaction document granting a security interest in any parcel of real property, to protect the interests and security of the bondholders, is therefore especially egregious.

29.     The only security ever granted in any of the transactions was to "[a]ll of Borrower's personal property of every kind and nature, whether now owned or hereafter acquired or arising,

---

[1] In November 2008, as DBSI was failing, Plaintiff Douglas Circle requested, as was his right under the Indenture, that TitleOne provide the documentation for the transactions done using REFCO bondholders' funds.

that is located on, appurtenant to, used in connection with, arising from, or related to" the property involved in the transaction. This phrasing obviously includes neither real property nor fixtures. TitleOne knew, or was presumed to know and understand the meaning of this fundamentally valueless "interest" and the difference between it and a genuine security interest in real property. Some of the underlying property was vacant, undeveloped land where there could not even conceivably have been personal property. Based on the documents provided by TitleOne, it appears that, with one exception, DBSI did not have any personal property "located on, appurtenant to, used in connection with, arising from, or related to" any of the properties. The one apparent exception was a non-performing loan in an amount equal to 2-1/2 times the appraised value of the underlying property (see Bayside Apartments Loans below).

30.     In addition to the complete absence of any security interests in any of the parcels of real property acquired with REFCO funds, TitleOne's documents show rampant fraud by DBSI. This fraud is obvious from a quick perusal of the documents – no particular skill is required to see it. The following paragraphs describe some, but hardly all, of what the documents show.

31.     **Bayside Apartments Loans.** Bayside Apartments is a subsidized housing complex in Seward, Alaska. On August 1, 1999, DBSI sold Bayside (the complex and the land) to Northwest Real Estate Capital Corporation, taking back an interest-only note for $1,509,278.43 at an interest rate of 6.67 percent. The entire principal amount of the loan was due on June 1, 2003.

32.     At the time of the sale to Northwest, DBSI owed Keycorp Real Estate Capital Markets, Inc., the sum of $358,000.00, which sum was secured by Bayside. The note from Northwest Real Estate Capital in favor of DBSI described in the previous paragraph was explicitly subordinated to the security interest of Keycorp Real Estate Capital Markets.

33.     On December 31, 2006, DBSI borrowed $600,000 from REFCO, using DBSI's "personal property" related to Bayside as security.  The note from Northwest Real Estate Capital was still outstanding at that point at the original 1999 amount of approximately $1.5 million, as apparently, too, was the Keycorp loan.

34.     The $600,000 loan from REFCO to DBSI was interest-only and was "secured" by "[a]ll of "Borrower's personal property of every kind and nature, whether now owned or hereafter acquired or arising, that is located on, appurtenant to, used in connection with, arising from, or related to" Bayside.

35.     This supposed security in DBSI's personal property interest in Bayside was subordinated to the note from Northwest Real Estate Capital, which in turn was subordinated to the security interest of Keycorp Real Estate Capital Markets.  In its application to REFCO for the loan, DBSI promised to file "a deed of trust and other ancillary security documents" as soon as "permitted during the term of this loan by any underlying senior lender. . . ."

36.     Included in TitleOne's documents is an appraisal of Bayside done in connection with the 2006 loan from REFCO to DBSI.  The appraisal concluded that the property, including the housing complex, had a fair market value of $600,000.  The appraiser believed that the property would be worth $1 million as a vacant lot, but, of course, the lot was not vacant.  Referring to the fact that operating expenses alone consumed almost 90 percent of rental income, the appraiser observed: "This is such a high expense percentage that it is amazing the property has been able to limp along for all these years."

37.     DBSI did not rest with using Bayside Apartments to steal $600,000 from the REFCO bondholders.  On June 30, 2008, DBSI increased the size of its loan from REFCO from $600,000

to $897,000.  The stated purpose of the increased amount was to pay off the Keycorp note that was secured by Bayside.

38.     In DBSI's 2008 request to the loan committee for the additional funds, the fair market value of Bayside was listed as $1,060,000, which was "based on a 2006 appraisal's conclusion of a value of $1,000,000 plus an assumption of 3% annual inflation."  The Northwest Real Estate Capital note was still outstanding; in fact, it appeared that Northwest had stopped paying even the interest,  because by 2008 accumulated interest had brought the total amount due on the note to $1,706,000, an increase of almost $200,000 since 2006.

39.     If TitleOne had merely read the documents in its possession, DBSI's fraud would have been clear and apparent.  The following are some of the obvious violations of the Indenture and clear evidence of fraud by DBSI in connection with the Bayside Property:

     a.  At the time of the 2006 loan, Bayside served as security for a loan of $1.5 million due to DBSI that had not been paid when due in 2003, and as security for a loan from Keycorp that had a claim senior to DBSI's Northwest loan, which was secured by a genuine security interest in the property.  Given the appraisal of $600,000, Bayside's value to DBSI was somewhere in the neighborhood of a negative $1.4 million.  Against this sterling asset DBSI took $600,000 of the REF bondholders' money.  All of the documents necessary to see this fraud were in TitleOne's possession.

     b.  The Indenture limited loans to no more than 85 percent of the fair market value of the underlying property.  Ind. § 1.20.  85 percent of a negative number is still a negative number, but even ignoring the senior claims to Bayside, $600,000 taken from REFCO for a property worth $600,000 violated section 1.20

    c.    DBSI intended to use the loan for "business and commercial purposes." The Indenture permitted bondholders' funds to be used only " to acquire, develop, and/or finance real estate properties prior to their sale, resale, financing, and/or syndication." Offering Circular, Feb. 10, 2003, at p. 10. *See also* Ind. §§ 1.17, 1.18, 1.19, 7.12.

    d.    In June 2008, when DBSI took another $297,000 out of REFCO using Bayside as "security," another $200,000 in unpaid interest had accrued on the Northwest Real Estate Capital Note, making Bayside even more unsuitable as security.

    e.    The new fair market value claimed in the 2008 loan application was a complete fabrication. The 2006 appraisal determined the fair market value of Bayside to be $600,000, not $1 million, and DBSI's 2006 loan application itself had stated that Bayside's fair market value was $600,000.

    f.    The grant of a security interest in "Borrower's personal property" interest in Bayside should have caused TitleOne particular alarm, if for no other reason than the fact that the appraiser had stated that Bayside would be worth more as a vacant lot. In any case, TitleOne's documents do not include a UCC-1 or anything else that might to serve to perfect this supposed security interest.

40.    Defendant TitleOne, in acting as Trustee under the Indenture, had only one purpose: to protect the interests of the REFCO bondholders. The 2006 Bayside loan violated the Indenture in multiple ways. Because the documentation supplied to it contains clear and obvious evidence of fraud, TitleOne knew or should have known at least as early as 2006 that the bondholders' money was being stolen by DBSI.

41.     **Broadway Plaza Term Loan Agreement.**  On December 31, 2007, REFCO made a loan of $1,950,000 to DBSI Broadway Plaza Limited Partnership.  The loan agreement is signed but the date of December 31, 2007, appears only on a cover page that does not appear to be part of the loan agreement.

42.     The loan application is dated January 11, *2008*, and is for $1,461,250, rather than $1,950,000.  Nothing in the documents provided by TitleOne explains the apparent backdating of the loan agreement or the discrepancy in amounts.

43.     According to Exhibit D of the application, the value of the property is $9 million "based on the sales price of the property."  There is nothing in the documentation supporting this number or providing the slightest clue about how the number was determined.  Included among TitleOne's documents is an appraisal dated January 26, 2007, valuing the property at $5,950,000.

44.     The promissory note, as with the case with Bayside and every other transaction for which TitleOne provided documentation, grants a "security interest" only in "Borrower's personal property."  No security interest was provided in the real property.

45.     Exhibit B, "Permitted Liens," says in its entirety:

> Such liens and encumbrances that currently exist on the property and which do not unduly interfere with its use as an apartment complex and senior loans secured by a deed of trust and other documents required by the lender in an amount of not more than $_____. (blank following dollar sign in original).

46.     The property in question is a shopping center anchored by a grocery store, and it is zoned for commercial use.  There are no apartment buildings on the site and the surrounding neighborhood consists of single-family homes.  All of this information is contained in the appraisal included in TitleOne's documents.

47.     The final page of the promissory note is called "Assignment of Promissory Note and Security Agreement" and is dated January 11, 2008.  This document purports to assign "all right, title, and interest in and to the foregoing Promissory Note and Security Agreement to TitleOne Corporation, Trust Department."

48.     As was the case with Bayside, there are multiple violations of the Indenture and red flags which are patent on the face of the documents provided to TitleOne.  These include a blatantly inflated and fraudulent fair market value; apparent backdating of loan documents; inconsistent loan amounts; violation of lending limits, illusory security, and more.  Once again it appears that TitleOne did not even read the documents.

49.     **Legacy Hills.**  On July 31, 2007, REFCO made a loan to DBSI Legacy Hills in the amount of $1,533,000.  Exhibit D to the loan application says the value of the property "based on the sales price" is $19,499,000.  There is nothing in the documents supporting this valuation.

50.     On August 31, 2007, the outstanding balance of the loan was increased to $4,493,000 "[d]ue to the additional funds advanced of $3,160,000 on August 31, 2007."  On October 31, 2007, the outstanding balance on the loan was increased to $5,693,000.  There is nothing in the documents providing any explanation for these additional transfers from REFCO.

51.     In fact, there is nothing in the documentation provided by TitleOne that even identifies the property.  The loan agreements state that a property description is to be attached, but none is.

52.     **Spur Ranch.**  On December 31, 2006, REFCO lent DBSI Spur Ranch $2,208,140 in connection with property intended for a housing development called the Spur Ranch Subdivision.  The loan may have been made in connection with the property, but it was not secured by the property since, as with all of the transactions for which TitleOne provided

documents, the DBSI borrowing entity provided security only in the "borrower's personal property" related to the property, which was undeveloped land.

53.     The loan application valued Spur Ranch at $6,160,000 "based on the expected net operating income of the improved property."  However, Exhibit B to the Promissory Note and Security Agreement valued Spur Ranch at "$8,750,000 based on the sales price of the property." Both documents are dated December 31, 2006, and both were signed by Douglas Swenson. Nothing in TitleOne's documents explains the discrepancy or supplies the slightest support for either value.

54.     **Kastera Homes LLC Palazzo House.**  On December 31, 2007 (or perhaps January 11, 2008, depending on which document is reviewed), REFCO loaned Kastera Homes (a DBSI wholly-owned entity) $1,550,000 for Kastera to use for" business and commercial purposes," a use not permitted by the Indenture.

55.     There are two loan applications which were presented in connection with this loan.  Both are dated January 11, 2008.  One is signed by Douglas Swenson, President of DBSI Housing; the other by Charles Hassard, Secretary of DBSI Housing.  Exhibit D to the application signed by Hassard says that the value of the property "is $4,895,000 based on the sales price of the property."  Exhibit D to Swenson's application says the value "is $7,000,000 based on the sales price of the property."

56.     In the documents provided by TitleOne, there are two loan applications and two term loan agreements in the amount of $1,550,000, dated the same day, and purporting to securitize the loan by "borrower's personal property" related to the same property.  These documents have wildly different, and equally unsupported, property valuations.  Whatever scheme DBSI was engaging in, and regardless of blatant were the discrepancies in what documentation was being

provided to it, it is clear that TitleOne was paying no attention whatsoever to the very persons and entities whose interests it was charged with protecting.

57.     Documentation provided by TitleOne in connection with additional transactions is depressingly similar.  Careful review of REFCO loans to DBSI entities in connection with the Black Cat, Valley View, Shadow Hills, Plantation, Peacock, and Kastera Pavilion properties reveals that:

      a.  None contains any document evidencing perfection of a security interest in anything;

      b.  All have identical Term Loan Agreements, save for the names, and the exhibit to each agreement listing senior loans is blank;

      c.  Valuation of the property is "based on the sales price of the property" with no appraisal or any other document supporting the stated amount;

      d.  No legal description of the property is attached to the loan application despite a reference to the attached legal description in the application;

      e.  Security is provided only in "borrower's personal property."

58.     There is further evidence of TitleOne's derelictions.  TitleOne provided Plaintiff Douglas Circle with a document dated October 21, 2008, from Bo Davies, Vice-President and General Counsel of Defendant TitleOne, to DBSI Real Estate Funding Corporation, attention Accounting Department.  The salutation read: "To whom it may concern."  In this letter, Mr. Davies said that TitleOne had not been paid for its services as Trustee in nine months and that, if payment was not received within 10 days, "TitleOne will be forced to resign as Trustee of the Bond."

59.     Even if grounds to resign had existed, the Indenture does not permit TitleOne simply to up and quit as Trustee.  The Indenture requires the Trustee to serve until a successor Trustee is appointed.  Indenture § 11.9.2.

60.     Moreover, DBSI's failure to pay the Trustee is an event of default under the Indenture. See Indenture § 9.1.4.  Section 11.2 of the Indenture provides as follows:

> **11.2   Notice of Events of Default**  Within 30 days after the occurrence of any Default or Event of Default known to the Trustee, the Trustee shall transmit by mail to all Bondholders notice of such Event of Default known to the Trustee.

The Trustee provided no such notice.

61.     In fact, the documents provided by TitleOne reveal on their face the existence of clear violations by DBSI of multiple provisions of the Indenture, not to mention outright fraud.  The requirement that TitleOne provide notice of default to the bondholders speaks as clearly as anything could that the REFCO bondholders were dependent on TitleOne to ensure that DBSI complied with the Indenture, and to notify them if DBSI failed to do so, in order that the bondholders could protect themselves.  TitleOne completely ignored its duties.

## CLASS ACTION ALLEGATIONS

62.     Plaintiffs seek to bring this case as a nationwide class action on behalf of themselves and all others similarly situated in the United States as members of the proposed Class, defined as follows:

> All persons and entities who are current bondholders of DBSI Real Estate Funding Corporation under an indenture between DBSI Real Estate Funding Corporation and TitleOne Corporation dated December 24, 2002.

63.     DBSI and all affiliated entities are excluded from the class.

64.     At the time of DBSI's bankruptcy in November 2008, the Firkins plaintiffs owned bonds with accumulated, unpaid interest equal to $1,261,318, the largest amount of any bondholder (considering the Firkins plaintiffs as a single bondholder).  The Circle plaintiffs owned bonds with accumulated, unpaid interest equal to $894,112, among the 10 largest investments.

65.     **Numerosity**.  The Class is so numerous that joinder of all of its members is impractical. A spreadsheet of bondholders as of the November 2008 bankruptcy filing of DBSI has 1,613 entries and approximately 600 separate bonds.

66.     **Common Questions of Law and Fact**.  Common questions of law and fact exist as to all Class members.  These questions predominate over the questions affecting only individual Class members.  Other than the amount of each class member's damages, there appear to be no questions of law or fact that are not common to the class.  The common legal and factual questions include, but are not limited to, the following:

> a.  the nature of Defendant's duties and obligations to the Plaintiffs and the members of the class under the Indenture;
>
> b.  what, if anything, Defendant did to ensure that DBSI used REFCO funds consistently with the limitations of the Indenture;
>
> c.  the documentation provided by DBSI to Defendant, and what Defendant did to remedy any shortcomings in that documentation;
>
> d.  whether any employee of Defendant TitleOne even read the documentation provided by DBSI;
>
> e.  whether Defendant breached its contractual obligations under the Indenture to the Plaintiffs and the members of the class;

    f.   whether Defendant satisfied its obligations as fiduciary to the Plaintiffs and the members of the Class;

    g.   whether Defendant was negligent or grossly negligent in performing its fiduciary duties; and

    h.   whether Defendant satisfied its duties as a trustee to the Plaintiffs and the members of the class under applicable statues defining the duties of a trustee.

67.    **Typicality**.  Plaintiffs' claims are typical of the claims of the Class in all respects.  Absent evidence, and Plaintiffs are aware of none, that a member or some members of the class were involved in the DBSI fraud, or in Defendant's dereliction of its fiduciary duties, the claims of all class members, including Plaintiffs, are the same in all respects except for amount.

68.    **Adequacy of Representation**.  Plaintiffs can and will fairly and adequately represent and protect the interests of the Class and have no interests that conflict with or are antagonistic to the interests of the Class.  Plaintiffs have retained attorneys competent and experienced in class action litigation to prosecute this action.  Geoffrey Bestor, a partner in Levetown & Jenkins, LLP, has been a member of the bar for almost 30 years, a federal prosecutor, and has represented clients in many large, complex class actions in federal courts around the country.  Philip Gordon and Bruce Bistline are long-time members of the bar of this Court and have represented plaintiffs in many class actions.

69.    **Superiority**.  A class action is superior to any other available method for the fair and efficient adjudication of this controversy, since, as demonstrated above, common questions of law and fact overwhelmingly predominate over any individual questions that may arise. Moreover, with over 600 or more potential Plaintiffs, individual litigation would be extremely

burdensome on the courts and the parties.  TitleOne has acted or refused to act on grounds

generally applicable to all members of the Class, thereby making appropriate any final judgment

with respect to the Class as a whole.

FIRST CAUSE OF ACTION

(Breach of Fiduciary Duty)

70.     Plaintiffs and the Class members reallege and incorporate each of the foregoing

paragraphs as if set forth fully herein

71.     TitleOne, as Trustee of the trust established by the Indenture of which the bondholders

were the beneficiaries, owed a fiduciary duty to Plaintiffs and the members of the Class.

72.     TitleOne breached its fiduciary duty to Plaintiffs and the Class members in ways set

forth in the preceding paragraphs of this Complaint, including, but not limited to, the following:

    a.   TitleOne failed to ensure that DBSI used REFCO funds in a manner
         consistent with the Indenture;

    b.   TitleOne failed to ensure that DBSI documented each transaction as required
         by the Indenture;

    c.   TitleOne failed to ensure that DBSI obtain security for loans from REFCO;

    d.   TitleOne failed to detect fraud apparent on the face of documents in
         TitleOne's possession;

    e.   TitleOne failed to notify bondholders of Events of Default known to it.

73.     As a result of TitleOne's breaches of its fiduciary duty, Plaintiffs and the Class members

were damaged:

    a.   by making investments that they would not have made, not redeeming
         investments, rolling over interest, and otherwise having their investments
         dissipated;

    b.   by TitleOne's failure to ensure that REFCO loans were secured such that
         Plaintiffs and the Class members would be secured creditors in DBSI's
         bankruptcy;

    c.   By preventing bondholders from protecting their interests in a timely fashion.

74.     Plaintiffs and the Class members have suffered aggregate damages in an amount exceeding $42 million.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

75.     Plaintiffs and the Class members reallege and incorporate each of the foregoing paragraphs as if set forth fully herein.

76.     The Indenture is a valid and enforceable contract between TitleOne and each of the Plaintiffs and Class members.

77.     TitleOne breached its contract with Plaintiffs and the Class members in the ways set forth in the preceding paragraphs of this Complaint, including, but not limited to, the following:

      a.  TitleOne failed to ensure that DBSI used REFCO funds in a manner consistent with the Indenture;

      b.  TitleOne failed to ensure that DBSI documented each transaction as required by the Indenture;

      c.  TitleOne failed to ensure that DBSI obtain security for loans from REFCO;

      d.  TitleOne failed to detect fraud apparent on the face of documents in TitleOne's possession;

      e.  TitleOne failed to notify bondholders of Events of Default known to it.

78.     As a result of TitleOne's breaches of the Indenture, Plaintiffs and the Class members were damaged in the following ways:

      a.  by making investments that they would not have made, not redeeming investments, rolling over interest, and otherwise having their investments dissipated;

b.  by TitleOne's failure to ensure that REFCO loans were secured such that Plaintiffs and the Class members would be secured creditors in DBSI's bankruptcy;

c.   by preventing bondholders from protecting their interests in a timely fashion.

As a result, Plaintiffs and the Class members have suffered aggregate damages in an amount exceeding $42 million.

## THIRD CAUSE OF ACTION

### (Negligence and Gross Negligence)

79.    Plaintiffs and the Class members reallege and incorporate each of the foregoing paragraphs as if set forth fully herein.

80.    As Trustee under the Indenture, TitleOne owed a fiduciary duty to each and every bondholder.

81.    TitleOne was negligent and grossly negligent in its discharge of its fiduciary duties.

82.    TitleOne's negligent and grossly negligent breaches of its fiduciary obligations directly and proximately caused the injuries to Plaintiffs and the Class members..

83.    As a result of TitleOne's negligence and gross negligence, Plaintiffs and the Class members have suffered aggregate damages in an amount exceeding $42 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Class request that the Court enter an order or judgment against TitleOne as follows:

a.    Certifying the proposed Class and ordering notice thereto to be paid by TitleOne;

b.      Adjudging and decreeing that TitleOne has engaged in the conduct alleged herein;

c.      Awarding compensatory and general damages according to proof on the various causes of action;

d.      Awarding both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

e.      Awarding costs of the proceedings herein;

f.      Awarding reasonable attorneys fees as allowed under law and the Indenture; and

g.      Awarding any and all such other and further relief that this Court may deem just and proper.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED:  February 26, 2010

_____/s/_____
Philip H. Gordon
Bruce S. Bistline ISBN 1988
**Gordon Law Offices**
623 West Hays Street
Boise, ID  83702
Tel: 208-345-7100
Fax: (208) 345-0050


Geoffrey Bestor
**LEVETOWN & JENKINS LLP**
700 12th Street, NW

Washington, DC 20005
Tel:  202-379-4899
Fax:  866-626-3131

*Attorneys for Plaintiffs*