# Exhibit D

Declaration of Douglas L. Swenson in Support of Chapter 11
Petitions and First Day Motions

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------ x
In re:                                           :   Chapter 11
                                                 :
DBSI, INC., et al.,[1]                           :   Case No. 08-12687 (PJW)
                                                 :
        Debtors.                                 :   Joint Administration Requested
                                                 :
------------------------------------------------ x
```

## DECLARATION OF DOUGLAS L. SWENSON IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Douglas L. Swenson, do hereby declare, under penalty of perjury, that:

1.      I am the President and Chief Executive Officer of DBSI, Inc. ("DBSI"), a corporation duly organized under and existing pursuant to the laws of the State of Idaho, and I am an officer, manager and/or director of each of the above-named debtors. In my capacity as such, I have detailed knowledge of and experience with the business and financial affairs of DBSI and its affiliates, who are debtors herein (each a "Debtor," and collectively, the "Debtors").

2.      In my above-described capacity, I am one of the representatives of the Debtors responsible for devising and implementing the Debtors' business plans and strategies, overseeing the Debtors' financial, operational and legal affairs, and supervising the maintenance of their books and records. In addition, in my above-described capacity, I have been involved in the Debtors' restructuring process (the "Restructuring Process"), including, inter alia, (i) participating in the development, negotiation and implementation of various strategic alternatives

---

[1] The last four digits of DBSI Inc.'s federal tax identification number are 5037. The mailing address for DBSI Inc. is 12426 West Explorer Drive, Suite 220, Boise, Idaho 83713. Due to the large number of Debtors in these cases, for which the Debtors have requested joint administration, a complete list of the Debtors, the last four digits of their federal tax identification numbers and their addresses is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed noticing and claims agent at www.kccllc.net/dbsi, or by contacting the proposed undersigned counsel for the Debtors.



for restructuring, reducing or modifying the Debtors' indebtedness, (ii) managing professionals engaged by the Debtors in connection with the Restructuring Process, (iii) supervising the preparation of documentation needed to implement the Restructuring Process, and (iv) consulting on a regular basis with the Debtors' other officers and executives, and members of the Debtors' Boards of Directors or their equivalent, with respect to the foregoing.

      3.      Today (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions (the "<u>Petitions</u>") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq.</u> (the "<u>Bankruptcy Code</u>"), in an effort to preserve and maximize the value of their chapter 11 estates.

      4.      The Debtors intend to operate their business and to manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

      5.      I am advised by counsel that this Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

**A.**      <u>**Overview of the Debtors' Businesses and History.**</u>

      6.      DBSI was founded in 1980 and is a direct or indirect parent or controlling entity to each of the other Debtors which collectively comprise a network of real estate entities which have interests in numerous commercial real estate projects and businesses. The Debtors are considered an industry leader in the areas of locating, acquiring, developing, providing, and managing real estate investment opportunities throughout the country. In 29 years, the Debtors have raised more than $1.5 billion in capital and currently manage assets valued at over $2.65 billion.

7.    The Debtors' offerings have included more than 250 traditional real estate offerings, more than 15 debt offerings, and numerous commercial real estate projects and businesses.  The Debtors' offerings include more than 200 tenant in common offerings in over 30 states.[2]

8.    The Debtors currently have 131 employees.

9.    The Debtors have traditionally generated revenue in several ways.  First, the Debtors generated revenue through the facilitation of tenant-in-common real estate sale transactions (each, a "TIC Transaction").  Under a typical TIC Transaction, DBSI or one of its wholly-owned subsidiaries (formed for the purposes of the individual TIC Transaction) acquired directly or contracted for the right to acquire real property improved by commercial or residential buildings (such as a retail shopping center, an office park or an apartment complex) (the "TIC Property").  A DBSI entity (typically a subsidiary of one of the Debtors) then located interested investors willing to purchase a fractional interest in the TIC Property to be owned by all such investors as a tenancy-in-common (the "TIC Investors").  The DBSI entity then sold the TIC Property to the TIC Investors, and earned a profit related to the sale (the "TIC Property Sale Fee").

10.    Simultaneously with the sale, a DBSI entity (in many instances formed for the purpose of the TIC Transaction) (each, a "DBSI Masterlessee")[3] entered into a master lease agreement (each a "Masterlease") with the TIC Investors pursuant to which the DBSI Masterlessee leased the TIC Property from the TIC Investors and sublet it to the commercial tenants.  A Debtor is currently a DBSI Masterlessee in more than 200 TIC Properties.

---

[2]  A more detailed description of tenant-in-common transactions is provided below.

[3]  The DBSI Masterlessee is typically either DBSI, DBSI Masterleaseco, Inc. ("DBSI Master") (a wholly-owned subsidiary of DBSI) or a direct subsidiary of DBSI Master.

11.     In its role as masterlessee, the DBSI Masterlessee collects rent from the commercial tenants (the "TIC SubRent") and pays, among other things, the operating expenses associated with the TIC Property (the "Operating Expenses"), rent to the TIC Investors (the "TIC Rent") and a management fee (the "Management Fee") to Debtor DBSI Realty Inc. ("DBSI Realty").[4] Under a typical TIC Masterlease, the TIC Rent includes, among other things, a fixed monthly payment to the TIC Investors (*i.e.* a monthly investment return) (the "TIC Return") and payment by the DBSI Masterlessee of the debt service (the "TIC Debt Service")[5] due to the lending institution (the "TIC Lender") who financed the acquisition of the TIC Property (the "TIC Loan"), which is typically secured by a mortgage on the TIC Property.[6] In many instances, DBSI, DBSI Master, an insider of DBSI or a combination of the three have guaranteed the TIC Loan. Additionally, in most if not all cases, each of the TIC Lenders has been granted an assignment of leases and rents with respect to the TIC Property securing its loan. That assignment purports to give the TIC Lender the right to collect any rents that accrue from the TIC Property following an uncured default under that TIC Loan.

---

[4] DBSI Realty is a wholly-owned subsidiary of DBSI, Inc. Generally, the DBSI Masterlessee enters into a property management agreement with DBSI Realty, which property management agreement sets forth the terms and conditions of DBSI Realty's management of the TIC Property, including the management fee payable to DBSI Realty. The TIC Property management and fees earned therefrom by DBSI Realty are referred to herein as the "Property Management Business").

[5] The TIC Debt Service is assumed by the TIC Investors upon their purchase of the TIC Property.

[6] In most instances, the TIC Loan to TIC Property cost-ratio was in the range of 50-70% at the time of the original TIC Transaction, therefore, the Debtors believe there is a significant equity cushion in favor of the TIC Lenders on most, if not all of the, TIC Properties.

12.    Generally, amounts remaining from the TIC SubRent after payment of the Operating Expenses, TIC Rent and Management Fee, represent the DBSI Masterlessee's and, in turn, the Debtors' profit on the Masterlease.[7]

13.    Although the foregoing is generally representative of the typical TIC Transaction, there are several variations of this transaction relative to the Debtors. For example, in certain of the TIC Transactions, a Debtor entity is, in effect, a TIC Investor in the sense that the DBSI entity that facilitated the TIC Transaction retained a fractional ownership interest in the TIC Property (typically 1% or less).[8]  Additionally, in other instances, DBSI Realty may manage commercial property for a group of TIC Investors even though there is no DBSI Masterlessee on that particular commercial property.

14.    Debtor DBSI Development Services LLC and DBSI Land Development LLC (collectively "DBSI Development") acquires, develops, improves and sells commercial real property in Idaho and elsewhere. The acquisition and development projects conducted by DBSI Development are largely funded by the Bonds, Notes and Staged Funds, as those terms are defined and discussed more fully below.

---

[7]  As noted above, DBSI Realty is paid a Management Fee from each DBSI Masterlessee related to the management of each TIC Property.  DBSI Realty then pays a third party asset management company a sub-management fee related to the management of each TIC Property.

[8]  In over 130 TIC Transactions, a wholly-owned subsidiary of Debtors DBSI or For 1031 LLC (which is a wholly-owned subsidiary of Debtor Spectrus Real Estate, Inc. ("Spectrus"), which is, in turn, wholly-owned by DBSI) (collectively, the "For 1031 Subsidiaries"), has retained a fractional tenant in common interest in the TIC Property. The For 1031 Subsidiaries are not debtors in these cases.

**B.    Corporate Structure.**[9]

15.    DBSI wholly owns, either directly or indirectly, each of the other Debtor entities described above (other than DBSI Securities Corporation and DCJ Inc.), including, but not limited to, DBSI Realty, DBSI Land Development LLC, Spectrus, DBSI Master and the DBSI Masterlessees.[10]  Debtors DBSI Securities Corporation and DCJ, Inc. are owned and controlled by insiders of DBSI.  DBSI also wholly owns, either directly or indirectly, numerous real estate ownership entities that are not debtors in these cases.  A chart showing the corporate organization of the entities representing the Debtors' primary layers of corporate organization is annexed hereto as Exhibit A.[11]

**C.    Debt Structure.**

**1.    The 2001 Bonds.**

*a.    The 2001A Bonds.*

16.    Pursuant to an offering circular dated March 1, 2001, Debtor DBSI 2001A Funding Corporation offered $5,000,000 aggregate principal amount of 11% Senior Bonds due December 31, 2008 (the "2001A Bonds").  The 2001A Bonds bear interest at the rate of 11% per annum, payable quarterly on January 15, April 15, July 15 and October 15 of each year.  The 2001A Bonds require DBSI 2001A Funding Corporation to redeem at par, at the request of a

---

[9] A more detailed description of the Debtors' corporate ownership structure is set forth in the Debtors' Ownership Statement Pursuant to Rules 1007(a)(1), 1007(a)(3) and 7007.1 of the Federal Rules of Bankruptcy Procedure, which was filed with the voluntary petition of DBSI.

[10] In addition, the Debtors own DBSI Discovery Real Estate Services LLC, a wholly-owned subsidiary of DBSI Realty.

[11] As indicated on the corporate organization chart attached as Exhibit A hereto, DBSI is a majority owner of DBSI Investments Limited Partnership which, in turn, has several subsidiary entities including Stellar Technologies LLC, DBSI Western Technologies LLC, Western Electronics LLC, Wavetronix LLC, iTerra Communications LLC, Gigoptix LLC, BioReaction Industries LLC and various real estate ownership entities.  These entities are not debtors in these cases.

holder of the 2001A Bonds on a first-come, first-served basis, up to 10% of the original 2001A

Bonds in any one calendar year.  The obligations under the 2001A Bonds are secured by real

property, assets, and ownership interests owned by certain direct and indirect subsidiaries of

DBSI, Inc. and are guaranteed by DBSI, Inc.  As of August 31, 2008, the outstanding

indebtedness under the 2001A Bonds was approximately $4,335,000.

          b.     *The 2001B Bonds.*

      17.     Pursuant to an offering circular dated June 20, 2001, Debtor DBSI 2001B

Funding Corporation offered $10,000,000 aggregate principal amount of 10% Senior Bonds due

December 31, 2008 (the "2001B Bonds").  The 2001B Bonds bear interest at the rate of 10% per

annum, payable quarterly on January 15, April 15, July 15 and October 15 of each year.  The

2001B Bonds require DBSI 2001B Funding Corporation to redeem at par, at the request of a

holder of the 2001B Bonds on a first-come, first-served basis, up to 10% of the original 2001B

Bonds in any one calendar year.  The obligations under the 2001B Bonds are secured by real

property, assets, and ownership interests owned by certain direct and indirect subsidiaries of

DBSI, Inc. and are guaranteed by DBSI, Inc.  As of August 31, 2008, the outstanding

indebtedness under the 2001B Bonds was approximately $9,240,000.

     c.     *The 2001C Bonds.*

      18.     Pursuant to an offering circular dated November 21, 2001, Debtor DBSI

2001C Funding Corporation offered $10,000,000 aggregate principal amount of 10% Senior

Bonds due December 31, 2009 (the "2001C Bonds" and collectively with the 2001A Bonds and

the 2001B Bonds, the "2001 Bonds").  The 2001C Bonds bear interest at the rate of 10% per

annum, payable quarterly on January 15, April 15, July 15 and October 15 of each year.  The

2001C Bonds require DBSI 2001C Funding Corporation to redeem at par, at the request of a

holder of the 2001C Bonds on a first-come, first-served basis, up to 10% of the original 2001C

Bonds in any one calendar year.  The obligations under the 2001C Bonds are secured by real

property, assets, and ownership interests owned by certain direct and indirect subsidiaries of

DBSI, Inc. and are guaranteed by DBSI, Inc.   As of August 31, 2008, the outstanding

indebtedness under the 2001C Bonds was approximately $8,951,000.

### 2.    **DBSI Real Estate Funding Corporation Bonds.**

19.    Pursuant to an offering circular dated February 10, 2003, Debtor DBSI

Real Estate Funding Corporation ("DBSI REFC") offered $42,170,000 aggregate principal

amount of 9% Senior Bonds due February 28, 2008 (the "REFC Bonds", and together with the

2001 Bonds, the "Bonds").  The REFC Bonds bear interest at the rate of 9% per annum, payable

monthly in arrears on the fifteenth day of the following month, commencing upon the issuance of

the REFC Bonds.  The REFC Bonds require DBSI REFC to redeem at par, at the request of a

holder of the REFC Bonds on a first-come, first-served basis, up to 10% of the original REFC

Bonds in any one calendar year.  The obligations under the REFC Bonds are secured by real

property, assets, and ownership interests owned by certain direct and indirect subsidiaries of

DBSI, Inc. and are guaranteed by DBSI, Inc. As of August 31, 2008, the outstanding

indebtedness under the REFC Bonds was approximately $35,612,000.

### 3.    **The 2005 Secured Notes.**

20.    Pursuant to a private placement memorandum dated August 9, 2005,

Debtor DBSI 2005 Secured Notes Corporation ("DBSI 2005 Secured Notes Corporation")

offered $55,000,000 aggregate principal amount of 8.15% Secured Notes due December 31,

2012 (the "2005 Secured Notes").  The 2005 Secured Notes bear interest at the rate of 8.15% per

annum, payable monthly in arrears on the fifteenth day of the following month, to holders of

record of the 2005 Secured Notes on the first day of each following month. Pursuant to the 2005 Secured Notes, on the last day of each year, commencing December 31, 2007, DBSI 2005 Secured Notes Corporation redeems at par, at the request of a holder of the 2005 Secured Notes on a first-come, first-served basis, up to 10% of the original 2005 Secured Notes in any one year. The obligations under the 2005 Secured Notes are secured by real property owned by certain direct and indirect subsidiaries of DBSI, Inc. and are guaranteed by DBSI, Inc. As of August 31, 2008, the outstanding indebtedness under the 2005 Secured Notes was approximately $54,138,018.

### 4.      **The 2006 Secured Notes.**

21.      Pursuant to a private placement memorandum dated October 4, 2006, Debtor DBSI 2006 Secured Notes Corporation ("DBSI 2006 Secured Notes Corporation") offered $75,000,000 aggregate principal amount of 8.41% Secured Notes due December 31, 2014 (the "2006 Secured Notes"). The 2006 Secured Notes bear interest at the rate of 8.41% per annum, payable monthly in arrears on the fifteenth day of the following month, to holders of record of the 2006 Secured Notes on the first day of each following month. Pursuant to the 2006 Secured Notes, on the last day of each year, commencing December 31, 2008, DBSI 2006 Secured Notes Corporation is obligated to redeem at par, at the request of a holder of the 2006 Secured Notes on a first-come, first-served basis, up to 10% of the original 2006 Secured Notes in any one year. The obligations under the 2006 Secured Notes are secured by real property owned by certain direct and indirect subsidiaries of DBSI, Inc. and are guaranteed by DBSI, Inc. As of August 31, 2008, the outstanding indebtedness under the 2006 Secured Notes was approximately $74,824,251.

5.   **The 2008 Unsecured Notes.**

22.   Pursuant to a private placement memorandum dated February 6, 2008,

Debtor DBSI 2008 Notes Corporation ("DBSI 2008 Notes Corporation") offered $90,000,000

aggregate principal amount of 9.5% Notes due December 31, 2015 (the "2008 Unsecured

Notes", and collectively with the 2005 Secured Notes and the 2006 Secured Notes, the

"Notes")).  The 2008 Unsecured Notes bear interest at the rate of 9.5% per annum, payable

monthly in arrears on the fifteenth day of the month following each holder's initial investment

and continuing monthly thereafter.  Pursuant to the 2008 Unsecured Notes, a certain percentage

of the 2008 Unsecured Notes are redeemable annually subject to certain conditions.  The

obligations under the 2008 Unsecured Notes are unsecured and are guaranteed by DBSI, Inc.  As

of August 31, 2008, the outstanding indebtedness under the 2008 Unsecured Notes was

approximately $88,673,374.

6.   **Reorganized Limited Partnerships**

23.   In the 1990s and early 2000s approximately 30 limited partnerships in

which DBSI, or a related entity, was the general partner were reorganized and some of the

limited partners received a put option to have their partnerships purchase their limited

partnership interest.  The collective purchase price for those partnership interests is around

$25,000,000.  DBSI has guaranteed the obligations of the partnerships to purchase the limited

partnership interests.

D.   **Development Funds**

1.   **DBSI Short-Term Development Fund LLC**

24.   Pursuant to a Private Placement Memorandum dated March 27, 2006,

Debtor DBSI Short-Term Development Fund LLC ("DBSI Short-Term") offered for sale up to

$20,000,000 in "Units" (ie; membership interests) in DBSI Short-Term in order to raise capital

for the acquisition and development of real property.  DBSI Short-Term is managed and all

voting units are owned by Debtor DBSI Development Services LLC.  As of September 30, 2008,

DBSI Short-Term had sold units with a total sale value of approximately of $19,500,000.

     2.     **DBSI 2006 Land Opportunity Fund LLC**

     25.     Pursuant to a private placement memorandum dated April 19, 2006,

Debtor DBSI 2006 Land Opportunity Fund LLC ("DBSI Land Opportunity") offered for sale up

to $25,000,000 in "Units" (*i.e.* membership interests) in DBSI 2006 Land Opportunity in order to

raise capital for the acquisition and development of undeveloped real property.  DBSI Land

Opportunity is managed and all voting Units are owned by Debtor DBSI Land Development

LLC ("DBSI Land Development").  As of September 30, 2008, DBSI Land Opportunity had sold

Units with a total sale value of approximately $24,703,000.

     3.     **DBSI 2007 Land Improvement & Development Fund LLC.**

     26.     Pursuant to a private placement memorandum dated January 24, 2007,

Debtor DBSI 2007 Land Improvement & Development Fund LLC ("DBSI Land Improvement")

offered $24,000,000 aggregate principal amount of 12% Development Notes due December 31,

2011 (the "2007 Land Improvement Notes").  The 2007 Land Improvement Notes bear interest

at the rate of 12% per annum.  Pursuant to the 2007 Land Improvement Notes, 10% of the 2007

Land Improvement Notes are redeemable annually on a first-come, first-served basis.  The

obligations under the 2007 Land Improvement Notes are unsecured.   Interested parties were

additionally offered the opportunity to purchase "Units" (*i.e.* membership interests) in DBSI

Land Improvement in order to raise capital for the acquisition and development of the real

property.  DBSI Land Opportunity is managed and all voting Units are owned by DBSI Land

Development.  As of September 30, 2008, the outstanding indebtedness under the 2007 Land Improvement Notes was approximately $23,797,029 and DBSI Land Improvement had sold Units with a total sale value of approximately $34,997,282.

**4.    DBSI 2008 Land Option Fund LLC.**

27.    Pursuant to a private placement memorandum dated July 11, 2008, Debtor DBSI 2008 Land Option Fund LLC ("DBSI Land Option") offered for sale up to $25,000,000 in "Units" (*i.e.* membership interests) in DBSI Land Option for the acquisition of residential, commercial, and/or industrial use land banking parcels.  DBSI Land Option is managed and all voting Units are owned by Debtor DBSI Asset Management LLC.  As of September 30, 2008, DBSI Land Option had sold Units with a total sale value of approximately $5,000,000.

**E.    Events Leading to the Debtors' Bankruptcy Filing.**

28.    A number of factors, acting in concert, have caused the Debtors to become overleveraged, necessitating the filing of these cases and the implementation of the restructuring strategy discussed more fully below.  First, because of the unprecedented events in the real estate, credit and other financial markets, the Debtors have been unable to raise sufficient new capital from investors or obtain sufficient new lending from institutional lenders necessary to continue their real estate acquisition and sale operations.  This business, which has always provided a significant portion of the Debtors' operating gross margin and profitability, has been discontinued as a result.  Second, rising operating costs and nationwide weakness in the commercial rental markets have had the overall effect of rendering the Debtors' overall Masterlease business an economic drain on their enterprise and have negatively affected the Debtors' development funds and real estate.  Third, the current moribund real estate market has hindered the marketability of the land collateral for most of the Bond and Note debtor-entities.

Fourth, amidst the Debtors' efforts to evaluate potential out-of-court restructuring alternatives, certain of the Debtors' stakeholders began taking precipitous actions that, absent the commencement of these cases, could have a disastrous effect on the Debtors' ability to preserve the value of their enterprise as a whole.  These actions included petitions by certain TIC Investors for temporary restraining orders to prevent the Debtors from utilizing the cash generated through the Masterleases and one of the Debtors' key commercial banks placing an administrative freeze on the Debtors' accounts and funds.

29.     Despite these severe conditions, the Debtors, in consultation with their advisors, have developed a restructuring plan to be implemented through these cases to provide a clear path for the emergence of the Debtors' core and most valuable business assets as a going concern.

**F.     Restructuring Strategy.**

30.     Prior to the Petition Date, the Debtors, in consultation with their advisors, developed a restructuring plan that the Debtors believe is best implemented through the chapter 11 process and will maximize the return to all of their creditor constituencies and stakeholders. In this regard, the Debtors – recognizing the significant value to be realized in the Property Management Business – have developed a strategy pursuant to which the Debtors intend to optimize the value of the Masterleases and Property Management Business and, thereafter, sell their core business enterprise to the highest and best bidder at an auction conducted under this Court's supervision and pursuant to sections 363 and 365 of the Bankruptcy Code.

31.     As a necessary element of this strategic restructuring process, the Debtors have categorized their Masterleases in four categories:  Tier A Masterleases, Tier B Masterleases, Tier C Masterleases and Tier D Masterleases.  Tier A Masterleases are

Masterleases in which the TIC Property generates revenue sufficient to cover the TIC Rent (*i.e.*

the TIC Debt Service and TIC Return) and Operating Expenses.  Tier B Masterleases are

Masterleases in which the TIC Property generates sufficient revenue to cover the TIC Debt

Service, Operating Expenses and some, but not the full, TIC Return.  Tier C Masterleases are

Masterleases in which the TIC Property generates sufficient revenue to cover the TIC Debt

Service and Operating Expenses only.  Finally, Tier D Masterleases are Masterleases in which

the TIC Property does not generate sufficient revenue to cover TIC Debt Service, TIC Return or

in some cases even Operating Expenses.

   32. Through these chapter 11 cases, the Debtors will seek this Court's

approval of the following strategy: (i) the rejection of each of the Tier D Masterleases effective

as of the Petition Date, thereby ridding their estates of the administrative drain of such

Masterleases on the Debtors' overall profitability; (ii) the renegotiation, to the extent possible, of

the terms of the Tier A, Tier B and Tier C Masterleases (collectively, the "Restructured

Masterleases") in a manner that maximizes the value of those Masterleases to the Debtors'

estates and creditors, and ensures the continued viability of those Masterleases to the TIC

Investors; and (iii) sale of the Restructured Masterleases and Property Management Business in a

Court-approved sale process (the "Sale Process") intended to preserve the value of the Debtors'

enterprise as a whole and maximize the value of the Debtors' estates for the benefit of all of their

stakeholders.

   33. Because the Debtors strongly believe that implementation of this

restructuring strategy is a matter of critical urgency, the Debtors have filed concurrently herewith

and will file shortly following the Petition Date (i) a motion pursuant to which they will seek

rejection of the Tier D Masterleases effective as of the Petition Date, and (ii) a motion pursuant

to which they will seek approval of the Sale Process to be implemented as soon as possible. The Debtors believe that immediate implementation of this restructuring strategy provides the Debtors' stakeholders with the highest probability of recovering value and will ensure the preservation of the Debtors' most valuable core assets – the Master Leases and the Property Management Business. With respect to the balance of the Restructuring Plan, the Debtors expect to consider a variety of options aimed at maximizing the value of the Debtors' other remaining assets, which will involve Debtor and non-Debtor DBSI controlled entities.

## G. First Day Motions.

34.     As a result of my personal experience, and through my review of various materials and information, discussions with other of the Debtors' executives, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in their "first-day" applications and motions described below (collectively, the "First Day Papers"), (b) the need for the Debtors to continue to operate effectively, (c) the deleterious effects upon the Debtors of not obtaining such relief, and (d) the immediate and irreparable harm to which the Debtors will be exposed immediately following the Petition Date unless the relief requested in the First Day Papers is granted without delay.

35.     I participated in preparing and have reviewed each of the First Day Papers (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Papers.

36.     The relief sought in the First Day Papers will minimize the adverse effects of the instant chapter 11 cases on the Debtors and result in maximum creditor recoveries. I believe that the relief sought in each of the First Day Papers is necessary to enable the Debtors to operate effectively in chapter 11 as debtors in possession.

37.     As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the Debtors' immediate operational needs are met and that the Debtors suffer no immediate and irreparable harm. I personally participated in the analysis that led to the creation of each of the First Day Motions and assisted in the drafting and development of the relief requested therein. At all times the Debtors' management and professionals remained cognizant of the limitations imposed on debtors-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtors' immediate operability.

### 1.     Motion for Joint Administration

38.     The Debtors believe that many of the motions, applications, hearings and orders that will arise in these chapter 11 cases will jointly affect each and every Debtor. Under these circumstances, the Debtors believe that the interest of the Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these chapter 11 cases for procedural purposes only. The Debtors further believe that joint administration of these chapter 11 cases will ease the administrative burden on the Court and all parties in interest and will protect creditors of the respective estates against potential conflicts of interest. For these reasons, the Debtors submit, and I believe, that the relief requested in this

motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

### 2.   Application to Retain Kurtzman Carson Consultants LLC

39.   By this Motion, the Debtors seek entry of an order authorizing the Debtors to retain Kurtzman Carson Consultants LLC ("KCC") as their claims, notice and balloting agent ("Agent").  Upon information and belief, KCC is an experienced Agent and is frequently used by debtors in large chapter 11 cases, and I believe KCC is well-qualified to serve as Agent in these cases.  The employment of KCC will also provide the Debtors with efficient management of the claims, noticing and balloting processes in these cases leaving the Debtors' management and professionals to focus on the Debtors reorganization efforts.

### 3.   Motion for Interim Order Deeming Utilities Adequately Assured

40.   By this motion, and to ensure continued provision of utility services (the "Utility Services"), the Debtors seek entry of an order prohibiting utility companies (the "Utility Companies") from terminating services on account of pre-petition invoices, deeming the Utility Companies to be adequately assured of future payment, and establishing procedures to determine additional adequate assurance.  The Debtors propose to establish a segregated account into which the Debtors will deposit a sum equal to 50% of the Debtors estimated monthly costs for Utility Services (collectively, the "Utility Deposit") and, additionally, have proposed procedures to address any request made by the Utility Companies for additional adequate assurance.

41.   Any disruption of Utility Services would cause irreparable harm to the Debtors' business operations and their estates.  The Debtors have hundreds of accounts with Utility Companies and have established a good payment history with virtually all of their Utility Companies.  To the best of the Debtors' knowledge, they have no defaults or arrearages of any

significance with respect to the Debtors' undisputed Utility Services invoices.  However, any disruption of Utility Services could have a significant impact on the Debtors' business operations, revenues, and employees.

42.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and creditors, and therefore should be approved.

### 4.     Motion for Authority to Pay Certain Pre-Petition Taxes

43.     By this motion, the Debtors request authorization (but not direction) to pay certain taxes that the Debtors are required to collect from third-parties and hold for a period of time before remitting them to the appropriate taxing authorities (the "Trust Fund Taxes"), and certain business and occupation taxes which the taxing authorities (the "Authorities") are authorized under state law to collect directly from the Debtors' individual officers and directors if such taxes remain unpaid (the "Business Taxes", and together with the Trust Fund Taxes, the "Taxes").  The Debtors seek authority to pay any Taxes that were accrued prepetition but were not in fact paid or processed prepetition, or were paid prepetition in an amount less than is actually owed, or to the extent any such payments made prepetition were rejected, lost or otherwise not received in full by any Authority.  Further, there may be Taxes incurred or collected from sales and services provided prepetition that will come due shortly after the filing, which the Debtors seek authority to pay pursuant to this Motion.  Finally, to the extent that any checks, drafts, deposits or transfers issued or initiated by the Debtors on account of prepetition Taxes have not cleared as of the Petition Date, the Debtors also seek an order directing banks and other financial institutions to honor and process such payments.

44.     Some, if not all, of the Authorities may initiate an audit of the Debtors if the Taxes are not paid on time.  Such audits will unnecessarily divert the Debtors' attention away from the reorganization process and result in unnecessary expenses.  Moreover, if the Debtors do not pay such amounts in a timely manner, the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, seek payment from the Debtors' directors and officers and pursue other remedies that will materially and immediately harm the estates.  Moreover, many of the outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the Authorities.  Therefore, such funds do not constitute property of the estate and could not otherwise be used by the estates.

45.     I believe that the Debtors' failure to pay the Taxes could have a material adverse impact on their ability to operate in the ordinary course of business and thus harm these reorganizations to the detriment of all constituents.  Additionally, any attempts to collect the Taxes from the Debtors' officer and directors has the potential to divert the attention of those individuals away from the reorganization process.  Therefore, I believe it is appropriate to pay, and the Debtors seek the authority to pay, in their sole discretion, the Taxes, including any penalties and interest thereon, if any, and any liability resulting from audits of prepetition Taxes, to the relevant Authorities in the ordinary course of business.

### 5.     Motion to Approved Continued Use of Cash Management System

46.     By this motion (the "Cash Management Motion"), the Debtors seek entry of an order (a) authorizing the continued use of their existing cash management system, (b) authorizing the continued use of their existing bank accounts and business forms, and (c) authorizing their deposit practices and waiving the requirements of section 345(b) in connection therewith on an interim basis.  In connection with this relief, the Debtors respectfully request a

waiver of certain of the operating guidelines established by the Office of the United States
Trustee for the District of Delaware that require the Debtors to close all prepetition bank
accounts, open new accounts designated as debtor-in-possession accounts, and provide new
business forms and stationary.

47.     As described in detail in the Motion, the Debtors maintain a cash
management and disbursement system in the ordinary course of their operations (the "Cash
Management System").  To lessen the disruption caused by the bankruptcy filings and maximize
the value of their estates in these chapter 11 proceedings, it is vital to the Debtors that they
maintain their Cash Management System.

48.     The Debtors maintain current and accurate accounting records of daily
cash transactions and submit that maintenance of this Cash Management System is vital to
prevent undue disruption to the Debtors' business operations while protecting the Debtors' cash
for the benefit of the estates.  It is critical that the Debtors be able to consolidate management of
cash and centrally coordinate transfers of funds to efficiently and effectively operate their large
and complex business operations.  Substantially disrupting their current cash management
procedures would impair the Debtors' operations and ability to optimize their business
performance.

**6.        Motion for Authority to Pay Employee Wage and Related Items**

49.     Pursuant to the Employee Wage Motion, the Debtors are seeking authority
to honor and pay all pre-petition employee wages, salaries and other accrued compensation, and
to continue to honor certain other policies, programs and benefits the Debtors provide to their
employees in the ordinary course of business.

50.     The uninterrupted continuation of the Debtors' business is critically dependent upon a stable work force.  The Debtors believe that any significant number of employee departures or deterioration in morale at this time will immediately and substantially adversely impact the Debtors' businesses and result in immediate and irreparable harm to the estates and their creditors.  There is a real, immediate risk that if the Debtors are not authorized to continue to honor their pre-petition employee obligations in the ordinary course, the employees would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' business operations and instantly destroying the prospects of a successful reorganization.  Consequently, the Debtors strongly believe that it is critical that they be permitted to pay their employees their pre-petition wages and continue with their ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date.

### 7.     Motion to Reject Certain Leases

51.     By this Motion, the Debtors are seeking the entry of an order authorizing the rejection of the Tier D Masterleases effective as of the Petition Date.

52.     As an integral component of the Debtors' efforts to maximize value for their estates and creditors by, among other things, eliminating unnecessary operating costs, the Debtors have determined that it is in their best business interest to avoid the accrual of any further obligations under the Tier D Masterleases.  The Debtors have reviewed each of the Tier D Masterleases and determined that they hold no material economic value to the Debtors or their estates and are not essential to the conduct of these bankruptcy cases.  As discussed above, the revenue generated by the Tier D Masterleases is insufficient to cover TIC Debt Service, TIC Return or in some cases even Operating Expenses.  The decision to reject the Tier D

Masterleases will eliminate the Debtors' obligation to perform, and the accrual of any further obligations, under the Tier D Masterleases.

53.     Moreover, as the Tier D Masterleases are unprofitable, the Debtors have determined that it would be futile to search for third parties that might be interested in accepting an assignment of one or more of the Tier D Masterleases.  I believe it is highly unlikely that the Debtors would ever be able to arrange for any disposition of the Tier D Masterleases that would be more favorable than rejection.  For these reasons, I believe that the Debtors' rejection of the Tier D Masterleases is a sound exercise of business judgment and should be approved.

### 8.     **The Cash Collateral Motion**

54.     Pursuant to the Cash Collateral Motion, the Debtors are seeking the entry of an Order authorizing them to use the cash generated from the management of the TIC Properties (the "Leasehold Cash"), against which, all of the TIC Lenders have asserted a claim (the "Cash Collateral").

55.     It is essential to the Debtors' efforts to maximize value in these cases that they maintain the use of the cash derived from managing the TIC Properties.  Under the terms of the Masterleases, the Masterlessee is entitled to sublet all or any portion of a TIC Property without the masterlessor's (i.e. the TIC Investor's) consent. The Masterleases further provide that so long as the Masterlessee is not in default under the Masterlease, the Masterlessee has the right to collect and receive all sublet rents for its own uses and purposes. Thus, the Leasehold Cash, over and above the rent payable to the Masterlessor and operating expenses belongs to the Masterlessee and may be used by the Masterlessee for any and all purposes.

56.     While the Debtors are entitled to use the Leasehold Cash, all of the TIC Lenders have asserted a secured claim against the Cash Collateral ranging from a valid, perfected

security interest in all of the Leasehold Cash to a limited security interest in discrete accounts

identified by certain TIC Lenders.  Since the number of TIC Transactions numbers

approximately 234, it was impractical, if not impossible, for the Debtors to negotiate cash

collateral agreements with all of the TIC Lenders in advance of the commencement of these

chapter 11 cases regarding the consensual use of cash collateral.  Nevertheless, the Debtors

submit that the uncontroverted facts in these cases provide the Court with sufficient evidence

with which to find that the TIC Lenders are adequately protected pursuant to section 361 and

363(e) of the Bankruptcy Code, to the extent that such TIC Lenders, in fact, possess valid,

perfected security interests in the Cash Collateral.

**H.**     **Conclusion**

57.     In conclusion, for the reasons stated herein and in each of the First Day

Papers filed concurrently or in connection with the commencement of these cases, including the

Payment Motions, I respectfully request that each of the First Day Papers be granted in its

entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated:  November 9, 2008

_____
Douglas L. Swenson
President and Chief Executive Officer of DBSI,
Inc., on behalf of DBSI, Inc. and each of its
affiliated Debtors and Debtors-in-Possession in
these Chapter 11 Cases

# EXHIBIT A

## Corporate Organization Chart

# Structure of Legal Entities

